**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **MASTERMIND INVOLVEMENT MARKETING, INC.,** | ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CASE NO.: 1:19-CV-00839-TWT** |
| **THE ART INSTITUTE OF ATLANTA, LLC, et al.** | ) ) ) | |
| **Defendants.** | ) | |

## THE AI DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

Defendants The Art Institute of Atlanta, LLC, The Art Institute of Austin, Inc., The Art Institute of Dallas, Inc., The Art Institute of Houston, LLC, The Art Institute of San Antonio, Inc., The Art Institute of Tampa, Inc., The Art Institute of Virginia Beach, LLC, and Miami International University of Art & Design, Inc. (collectively, the "AI Defendants"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, submit this Motion for Preliminary Injunction.

As discussed in the supporting Memorandum of Law and the Declaration of Rebecca Adams ("Adams Declaration) (attached hereto as "Exhibit 1"), the AI Defendants seek an injunction from this Court ordering Plaintiff MasterMind Involvement Marketing, Inc. ("MasterMind") to transfer control over the AI Defendants' dozens of social media accounts back to the AI Defendants. Upon

issuance of an injunction and the transfer of control, the parties can then proceed to litigate their remaining claims, or possibly pursue settlement.

## MEMORANDUM OF LAW

The AI Defendants submit this Memorandum of Law in support of their Motion for Preliminary Injunction. This brief will discuss the background to the instant dispute, describe the harm to the AI Defendants from not having access to their social media accounts, and explain why issuing an injunction would be consistent with what other courts have done in similar cases.

## INTRODUCTION

The AI Defendants need an injunction to regain control over the dozens of social media accounts they use to market and advertise their schools to prospective students. Plaintiff MasterMind was hired to manage and control the AI Defendants' social media accounts. Since January 2019, however, MasterMind has unlawfully withheld the passwords and administrative rights to those accounts. MasterMind began doing so after it came to believe the AI Defendants breached their agreement by not paying for its services. Yet instead of pursuing a remedy within the confines of the law, MasterMind took matters into its own hands in extortionist fashion by refusing to return the passwords until it received payment. While MasterMind eventually filed this lawsuit, it continues to deny the AI Defendants access to the accounts. This Court should order MasterMind to transfer control over the accounts back to the AI Defendants, at which point the parties can litigate the merits of the remaining claims. MasterMind's conduct has already caused the AI Defendants

serious reputational harm and undoubtedly led countless prospective students to enroll somewhere else.

## FACTUAL BACKGROUND

The AI Defendants are eight post-secondary educational institutions offering masters, bachelors, and associate degrees in visual, creative, applied, and culinary arts. Adams Decl. ¶ 3. The schools are located in Atlanta, Austin, Dallas, Houston, San Antonio, Tampa, Virginia Beach, and Miami. *Id.*

Each of the AI Defendants has its own local campus account on various social media platforms. *Id.* ¶ 4. For example, AI Atlanta has accounts with Facebook, Instagram, and Twitter. There are also "national" social media accounts (i.e., accounts that do not relate to a specific campus) for The Art Institutes brand on these same social media platforms, and several other platforms. *Id.* ¶ 5. In total, the AI Defendants have over 30 social media accounts (including both local accounts and the national accounts) on more than 8 different platforms. *Id.* ¶ 6. Unless otherwise specified, "the AI Defendants' social media accounts" refers to both the local campus accounts and the national accounts.

In February 2018, the then-parent company of the AI Defendants, DCEH, hired MasterMind to manage the AI Defendants' social media accounts. *Id.* ¶ 9. Under the Master Services Agreement, which governed the services MasterMind would perform, MasterMind acquired full and unfettered access to the AI

Defendants' social media accounts on several different platforms, such as their accounts on Instagram and Twitter, among others. *See id.* at Exhibit A (Master Services Agreement). Among other services, MasterMind's responsibilities included "posting" to the accounts on a daily basis. *Id.* Marketing and advertising through social media is a primary means by which the AI Defendants attract new customers and generate revenue. *Id.* ¶ 7.

MasterMind shared access to the accounts with DCEH employees and the AI Defendants' employees. *Id.* ¶ 10. These employees could log in to any of the accounts at any time in order to post news updates and advertisements, respond to customer inquiries, and do whatever else was necessary to maintain the relevancy of the Art Institute brand and online profile. *Id.*

The Master Services Agreement also provided that all work created or developed by MasterMind was the property of DCEH, and that MasterMind had to return all confidential information to DCEH upon request. *See, e.g.*, *id.* at Exhibit A, ¶¶ 5.2; 5.6; 6.1. 6.3.

In January 2019, DCEH sold the AI Defendants to Education Principle Foundation ("EPF"). Adams Decl. at ¶ 12. As part of that larger transaction, DCEH also sold the ownership rights for the AI Defendants' social media accounts to Art Institute International, LLC ("AII"). *Id.* AII, at this same time, entered into a services agreement with Studio Enterprises Manager, LLC ("Studio") under which Studio

would, among other things, control and manage the AI Defendants' various social media accounts. *Id.* Following the January 2019 transaction, DCEH entered into receivership. *Id.* ¶ 13.

After learning of the sale and DCEH's receivership, MasterMind stopped posting on the accounts and refused to give the AI Defendants and AII the passwords and/or administrative rights needed to login to the accounts in order to prevent them from accessing the accounts. *Id.* MasterMind likewise began changing the passwords and/or administrative rights to the accounts, and informed the AI Defendants that it would not transfer the accounts back to them until it received payment for the services it allegedly performed under the Master Services Agreement. *Id.*

As of the date of this filing, MasterMind still has not transferred control over various accounts to the AI Defendants, despite repeated requests from the AI Defendants. *Id.* ¶ 14-15. Meanwhile, enrollment has dropped at each of the AI Defendant schools since January 2019. *Id.* ¶ 16.

## LEGAL STANDARD

A preliminary injunction may be issued when the movant demonstrates "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction is issued, and (4) an injunction would not disserve

6

the public interest." *Odebrecht Const., Inc. v. Secretary, Florida Dep't of Transp.*, 715 F.3d 1268, 1273–74 (11th Cir. 2013). "To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

## ARGUMENT

MasterMind should be ordered to immediately give the AI Defendants the passwords, administrative rights, and any other information necessary to enable them to login and access their social media accounts, including but not limited to their accounts on Instagram and Twitter. As discussed below, several courts have held that denying the rightful owner access to its social media account is the proper subject of an injunction. Indeed, as this case demonstrates, preventing a company from accessing its lawfully-owned property is precisely the type of harmful conduct that ought to be enjoined: the injury to the AI Defendants is irreparable and difficult to quantify; the harm suffered by MasterMind is non-existent; and the public interest disfavors holding property hostage to extort payment.

### A. **The AI Defendants are likely to succeed on their counterclaims.**

The AI Defendants are likely to succeed on the merits of each of their five counterclaims against MasterMind: (1) misappropriation of trade secrets under the Georgia Trade Secrets Act; (2) conversion; (3) breach of fiduciary duty; (4)

negligence; and (5) violation of the Computer Fraud and Abuse Act. To be clear though, "[t]he Court need not conclude that [the AI Defendants] have carried their burden of proof on any single claim or on all claims, only that the proof supports a substantial likelihood of success *on at least one claim* or theory which in turn would support a preliminary injunction." *Atlanta Sch. of Kayaking, Inc. v. Douglasville-Douglas Cty. Water & Sewer Auth.*, 981 F. Supp. 1469, 1472 (N.D. Ga. 1997) (emphasis added).

### 1. Georgia Trade Secrets Act

A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act ("GTSA") requires that a plaintiff demonstrate that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret. O.C.G.A. § 10-1-761; *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1410 (11th Cir. 1998).

A "[t]rade secret" means "information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can

obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.C.G.A. § 10-1-761(4). This Court has explained that "[a] defendant misappropriates a trade secret when the defendant acquires a trade secret from someone the defendant has reason to know acquired the trade secret by improper means, or when the defendant 'discloses or uses a trade secret of another, without express or implied consent, knowing that at the time of disclosure or use the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'" *Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*, No. 1:10-CV-03029-JEC, 2011 WL 13217738, at *8 (N.D. Ga. Dec. 13, 2011) (quoting *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003)).

In this case, the AI Defendants' social media accounts, including the passwords and administrative rights, as well as the unique methods they utilize when selecting what content to post, are "trade secrets." *See* Adams Decl. ¶ 8 (explaining how the AI Defendants have internally developed policies regarding what content to post on social media). While no court appears to have considered whether social media accounts are "trade secrets" under the GTSA, other courts have suggested that they are under similar state laws. For example, in *PhoneDog v. Kravitz*, No. C 11-03474 MEJ, 2011 U.S. Dist. LEXIS 129229, at *20 (N.D. Cal. Nov. 8, 2011), a former employee was sued by her former employer for misappropriation of trade

secrets after she refused to give up control of the company's Twitter account ,which had over 17,000 followers. *See id.* The Northern District of California denied the employee's motion to dismiss the misappropriation of trade secrets claim since there were evidentiary issues surrounding whether a Twitter account password and Twitter followers were protected "trade secrets" under California law. *Id.* at 15-20. Similarly, in *Christou v. Beatport*, 849 F. Supp. 2d 1055, 1074-76 (D. Colo. 2012), the District of Colorado ruled that a MySpace friends list could constitute a protectable trade secret and the misappropriation of that list by a former employee could be imputed to the employee's rival company, which used the MySpace friend list to benefit it. *Id.* The strategic value of such a list, according to the *Christou* court, derived from social media networking sites' ability to grant a business access to the contact information, an explanation of preferences and interests of those potential customers, and a "built-in" platform to contact those persons. *See id*. According to the court, "'friends are more than simple lists of names of potential customers." *Id.* at 375.

For these same reasons, the AI Defendants' social media accounts, including the passwords, administrative rights, and customer lists, should be considered trade secrets under the GTSA. The passwords and administrative rights, as well as the customers with whom the AI Defendants communicate via their social media platforms, constitutes information that is not publicly known and that derives

economic value from not being known. *See* Adams Decl. ¶ 8. Access to these potential customers and their information has taken immense amount of time to develop. Further, the unique methods the AI Defendants employ when posting news updates, advertisements, and other messages to their social media accounts are confidential and could not be duplicated. *Id.* (explaining how AI Defendants' social media policies are confidential). The AI Defendants took efforts – albeit to a degree unintended – to maintain the secrecy of the passwords and posting methods.

MasterMind has "misappropriated" these trade secrets because it is using the passwords without the AI Defendants' consent, and knew at the time of using the passwords that they were "acquired under circumstances giving rise to a duty to … limit its use." *Burroughs*, 2011 WL 13217738, at *8. Courts have recognized that a misappropriation of trade secrets claim under the GTSA occurs when a party uses a password to access a computer program or feature that they were not otherwise allowed to access. *See Telecom Tech. Servs. Inc. v. Rolm Co*., 388 F.3d 820, 832-33 (11th Cir. 2004) (affirming jury verdict where defendants were found liable for trade secret misappropriation because they used plaintiff's passwords to activate additional features); *Burroughs*, 2011 WL 13217738, at *8 (denying motion to dismiss claim asserted under GTSA where defendant "was not authorized to have or use the password" to the plaintiff's computer programs and software).

Accordingly, because the passwords, administrative rights, customer lists, and the unique methods for posting to the accounts all constitute "trade secrets," and because MasterMind "misappropriated" those trade secrets by using them without consent, the AI Defendants have a strong likelihood of success on their claim against MasterMind for misappropriation of trade secrets under the GTSA.

### 2. Conversion

Because the AI Defendants are likely to succeed on their claim under the GTSA, this Court need not consider whether they are also likely to succeed on any other claims before issuing an injunction. *See Atlanta Sch. of Kayaking*, 981 F. Supp. at 1472 (court need only conclude that "the proof supports a substantial likelihood of success **on at least one claim** or theory") (emphasis added). Nevertheless, the AI Defendants are also likely to succeed on their conversion claim.

In Georgia, "to establish a claim for conversion, the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Internal Med. All., LLC v. Budell*, 290 Ga. App. 231, 239, 659 S.E.2d 668, 675 (2008). "[C]onversion requires proof of "a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Phillips v. Publ'g Co., Inc.*, No. CV213-069, 2015 WL 5821501, at *25 (S.D. Ga. Sept. 14, 2015).

As with the misappropriation of trade secrets claim, while it does not appear that courts have considered under Georgia law whether there is a conversion when an unauthorized party accesses another party's social media accounts, courts in other jurisdictions have held that such conduct amounts to a conversion. *See, e.g.*, *Ardis Health, LLC v. Nankivell*, No. 11 CIV. 5013 NRB, 2011 WL 4965172, at *2 (S.D.N.Y. Oct. 19, 2011) (holding that online accounts and websites can be the object of conversion under New York law); *Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16 CIV. 2555 (KMW), 2017 WL 239379, at *3 (S.D.N.Y. Jan. 18, 2017) (following *Ardis* and holding that under New York law, Twitter and Facebook accounts are intangible property and that the wrongful taking of such property could constitute tortious misconduct under conversion and replevin claims).

In *Ardis*, the Southern District of New York entered a preliminary injunction against a former employee of a company whose duties included maintaining social media pages, blogs, and websites for the company's "closely affiliated online marketing companies." 2011 WL 4965172, at *4-5. The employee had signed a contract at the start of her employment requiring her to return all confidential information at the employer's request. *Id.* at *1. The contract also stipulated that the work she developed or created while employed was the "sole and exclusive property" of the employer. *Id.* After the employee was terminated, she refused to provide the affiliated companies with the access information to the social media

accounts, emails, and websites. *Id.* at *2. The affiliated companies sued, alleging that her refusal prevented them from accessing the accounts and websites. The court ruled that the companies owned the rights to the access information unlocking the social media accounts, email accounts, and websites, and suggested that the former employee's "unauthorized retention" of that information likely constituted conversion under New York law. *Id.* at *3. Implicit in the ruling was the district court's determination that the social media accounts managed by the former employee were the property of the employer and probably also the affiliated companies. The district court therefore ordered the former employee to immediately provide the employer and affiliated companies with the access information. *Id.*

A federal bankruptcy court in Texas reached a similar result in *In re CTLI, LLC*, 528 B.R. 359 (Bankr. S.D. Tex. 2015). There, the court ruled that social media accounts constitute intangible property and are legally protectable assets identical to other assets held by a business organization. *Id.* at 362. According to the court, "business social media accounts are property interests. Like subscriber lists, business social media accounts provide valuable access to customers and potential customers." *Id.* at 367.

Under *Ardis* and *Salonclick*, if a business organization owns the right to the access information unlocking social media accounts, unauthorized retention of that access information constitutes conversion of property. Similarly, under *CTLI*, social

media accounts constitute "property interests" that can be converted. The well-reasoned decisions in *Ardis*, *Salonclick*, and *CTLI* should lead this Court to hold that the AI Defendants are also likely to succeed on their conversion claim against MasterMind.

### 3. Breach of Fiduciary Duty

The AI Defendants are also likely to succeed on their breach of fiduciary duty claim against MasterMind. Under Georgia law, "[e]stablishing a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Wells Fargo Bank, N.A. v. Cook*, 332 Ga. App. 834, 842, 775 S.E.2d 199, 206 (2015).

Here, MasterMind acquired a fiduciary duty to the AI Defendants when it was hired by DCEH in February 2018. Adams Decl. ¶ 9. MasterMind was hired because of its expertise in social media marketing and advertising. *Id.* At that time, it acquired complete control over and access to the AI Defendants' social media accounts, and was entrusted with the passwords and administrative rights to the accounts. *Id.* The AI Defendants even allowed MasterMind to store the passwords to the accounts in MasterMind's own software program ("Last Pass"), which MasterMind recommended to the AI Defendants as a better and more secure location than where the passwords were previously being stored. *Id.* ¶ 11.

15

In a case nearly identical to this one, *Keypath Educ., Inc. v. BrightStar Educ. Grp., Inc.*, No. 16-CV-2545-JWL, 2017 WL 411353 (D. Kan. Jan. 31, 2017), the District Court of Kansas held that the plaintiff, who was hired to manage the defendants' social media accounts, "knowingly assumed [a] [fiduciary] duty when Defendants apparently relinquished control over its social media accounts to Plaintiff and Plaintiff exercised total control over those accounts." *Id.* at *3.

Here too, MasterMind assumed a fiduciary duty to the AI Defendants when it acquired complete control over the passwords and accounts in February 2018. MasterMind then breached that fiduciary duty when it refused to transfer control of the accounts in January 2019. MasterMind's conduct has proximately caused the AI Defendants damages because they have lost potential customers (prospective students) and harmed their online reputation. *See* Adams Decl. ¶ 16.

In *Keypath* and other cases just like this one, courts have found that companies hired to manage social media accounts breached their fiduciary duties when they refused to transfer control over the accounts after the contractual relationship terminated. *See Keypath*, at *3 (denying former employee's motion for judgment on the pleadings on employer's breach of fiduciary duty claim); *see also River Servs. Co. LLC v. Peer*, No. CV 17-2691, 2017 WL 1407894, at *2 (E.D. La. Apr. 20, 2017) (finding a likelihood of success on breach of fiduciary duty claim

and issuing injunction where defendants refused to transfer control to websites owned by plaintiffs).

The AI Defendants therefore are likely to succeed on their breach of fiduciary duty claim, in addition to their conversion and misappropriation of trade secrets claims.[1]

### 4.  Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C)

Finally, the AI Defendants are likely to succeed on their claim against MasterMind under the Computer Fraud and Abuse Act ("CFAA"). *See* Tiffany A. Miao, *Access Denied: How Social Media Accounts Fall Outside the Scope of Intellectual Property Law and into the Realm of the Computer Fraud and Abuse Act*, 23 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1017 (2013) (arguing that the authorization framework of the Computer Fraud and Abuse Act provides a superior framework to intellectual property frameworks when resolving social media account disputes).

"The CFAA was intended … to deal with 'hacking' or 'trespass' onto private, often password-protected mainframe computers." *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1109 (N.D. Cal. 2017). The statute prohibits one from "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected

---

[1] For similar reasons, the AI Defendants are likely to succeed on their negligence claim.

computer." 18 U.S.C. § 1030(a)(2)(C). As the Supreme Court has explained, the statute "provides two ways of committing the crime of improperly accessing a protected computer: (1) obtaining access without authorization; and (2) obtaining access with authorization but then using that access improperly." *Musacchio v. United States*, 136 S.Ct. 709, 713 (2016). "Protected computer" means a computer "which is used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2)(A). The statute provides a private cause of action where the offense causes an aggregate loss of more than $5,000 in a one-year period. *Id.* § 1030(c)(4)(A).

MasterMind's computers are "protected computers" under the CFAA. *See United States v. Pires*, 642 F.3d 1, 9 (1st Cir. 2011) (holding that transmission over the Internet qualifies as interstate commerce under 18 U.S.C. § 2252); *United States v. Drew*, 259 F.R.D. 449, 457 (C.D. Cal. 2009) (holding that obtaining access to a website satisfies the interstate commerce component of the CFAA); *United States v. Valle*, 807 F.3d 508, 528 (2d Cir. 2015) (noting that the term "protected computer" means "effectively all computers with Internet access") (quoting *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012)).

MasterMind's conduct fits perfectly within the CFAA's prohibition against computer trespassing and hacking. MasterMind exceeded the initial authority it had with respect to the accounts when it accessed its computers to login and change the

AI Defendants' social media accounts' passwords and/or administrative rights without their knowledge or consent to do so. Several courts have held that former employees violated the CFAA by unlawfully retaining access to their employers' password-protected computers, websites, and/or online accounts after the employment relationship ended. *See, e.g.*, *United States v. Steele*, 595 F. App'x 208, 211 (4th Cir. 2014) (former employee who continued to login to his former employer's server through an account he had used while working for the employer in order to gain access to confidential and proprietary information violated the CFAA); *Sell It Soc., LLC v. Strauss*, No. 15 CIV. 970 (PKC), 2018 WL 2357261, at *1-3 (S.D.N.Y. Mar. 8, 2018) (former employee exceeded authorization under CFAA when he accessed and downloaded employer's customer database; fact that former employee still had login credentials to the database post-employment did not mean he was "authorized" to access the database). Because what MasterMind did (and continues to do) to the AI Defendants is no different than what these individuals did to their former employees, the AI Defendants are likely to succeed on their CFAA claim.[2]

---

[2] A party suing under the CFAA must have suffered a loss of at least $5,000. As discussed *infra*, in the few months that they have not had access to their accounts, the AI Defendants have suffered a loss much greater than $5,000, though it difficult to estimate exactly how much they have lost.

**B. <u>The AI Defendants are suffering irreparable injury.</u>**

Under the second element of the preliminary injunction analysis, the AI Defendants have suffered, and will continue to suffer irreparable injury if an injunction is not granted. The AI Defendants depend heavily on their online presence to advertise their schools, which requires the ability to continuously update their online social media profiles and react to online trends. Adams Decl. ¶ 7. The AI Defendants currently are unable to perform the day-to-day marketing and advertising of their educational services that enables them to reach and attract new customers. *Id.* ¶ 14. For example, the AI Defendants are not able to respond to customer inquiries made on their social media profile pages. *Id.* ¶ 7. Potential students frequently ask the AI Defendants questions via their social media accounts – but these questions are not being answered right now, making the AI Defendants appear unresponsive. Simply put, every day that the AI Defendants cannot promote their educational services is another day that the AI Defendants are prevented from effectively competing in the market for those services. The inability to do so has an injurious effect on the AI Defendants' reputation. The magnitude of the harm to the AI Defendants' reputation is difficult, if not impossible, to quantify in monetary terms. Similarly, the number of customers that the AI Defendants have not attracted through its social media outreach efforts is difficult to pinpoint.

Several courts have issued injunctions in cases exactly like this one, ordering the party withholding passwords or restricting access to social media accounts to transfer them back to the rightful owner. *See, e.g.*, *Ardis*, 2011 WL 4965172, at *2; *River Servs.,* 2017 WL 1407894, at *3. For example, in *Ardis*, the court issued an injunction ordering the transfer of passwords back to the owner, and explained how the **"Plaintiffs depend heavily on their online presence to advertise their businesses, which requires the ability to continuously update their profiles and pages and react to online trends. The inability to do so unquestionably has a negative effect on plaintiffs' reputation and ability to remain competitive, and the magnitude of that effect is difficult, if not impossible, to quantify in monetary terms. Such injury constitutes irreparable harm."** 2011 WL 4965172, at *2 (emphasis added). That is exactly what is happening to the AI Defendants. Similarly, in *River Services*, the court observed that "[i]f [the defendant] [is] allowed to continue to hold the websites hostage and refuse to transfer control, [plaintiff] will suffer a disruption of business and customer relations." 2017 WL 1407894, at *3 (holding that plaintiffs showed that they will suffer irreparable harm if an injunction is not issued). That too is happening to the AI Defendants.

Commentators also recognize both the reputational harm and the financial harm that companies suffer if they cannot market and advertise their products through social media. "The reputational risk to a business associated with the loss of

21

its ability to control messaging on its social media accounts compounds the harm resulting from financial losses such as lost revenue. A hostile takeover of a social media account by a disgruntled employee, independent contractor, former business partner, or management company could result in significant reputational harm or damage to the brand which is not easily remedied or repaired." Kathleen McGarvey Hidy, *Business Disputes over Social Media Accounts: Legal Rights, Judicial Rationales, and the Resultant Business Risks*, 2018 COLUM. BUS. L. REV. 426, 487 (2018).

Thus, it is clear that the AI Defendants will suffer irreparable injury if the Court does not issue an injunction because their reputations will be damaged and prospective students may ultimately enroll elsewhere.

### C. **The harm to MasterMind is non-existent and thus is outweighed by the AI Defendants' harm.**

The third element of the preliminary injunction analysis requires a balancing of the parties' respective harms if the injunction is issued. There is nothing to balance in this case, however, since MasterMind would literally not suffer any injury whatsoever if the injunction is issued. If MasterMind is ordered to give the AI Defendants the passwords, all MasterMind would have to do is inform the AI Defendants of the current passwords to the accounts. That could be performed in a matter of minutes, so there is no administrative burden associated with an injunction. Moreover, MasterMind's present ability to access the AI Defendants' social media

accounts provides it with no monetary benefit, so it would not suffer any sort of financial harm from an injunction. Simply put, MasterMind's day-to-day business – marketing and advertising services – would not be impacted in any fashion.

What would happen to MasterMind is that it would lose its leverage to extort payment from the AI Defendants for the services it allegedly performed under the Agreement. But that is not the type of "harm" relevant to this analysis because MasterMind was not allowed to employ such coercive tactics in the first place. MasterMind's remedy to recover for non-payment under the Master Services Agreement was to assert a breach of contract action. It certainly was not to hold the accounts' passwords hostage and pressure the AI Defendants into paying until they broke. That is borderline blackmail.

MasterMind eventually filed the instant lawsuit, which is the proper way to attempt to settle a legal dispute. Now that this action is pending, MasterMind should transfer control of the accounts back to the AI Defendants so that the Court can adjudicate the claims in MasterMind's complaint. The Eastern District of Louisiana in *River Services* faced a nearly identical situation where one party refused to transfer control of the other party's website until it received payment. *See* 2017 WL 1407894, at *1-3. In issuing an injunction ordering the transfer of control back to the owner, the court remarked that "[it] cannot identify any harm to Defendants that would result from the issuance of this injunction. ***While Defendants purportedly seek***

***additional payment from Plaintiffs for their services, such can still be sought after***

***control of the websites is transferred***." *Id.* at *3 (emphasis added).

Here too, MasterMind can try and seek payment, through this litigation, for the services it allegedly rendered under the Agreement.[3] But there is no authority that would allow MasterMind to retain personal property that does not belong to it in order to recover for what it believes was a breach of contract. Following that logic, anyone would be justified in stealing the property of another in order to right a perceived wrong. This is not how the legal system works.

Thus, the serious reputational injury to the AI Defendants outweighs whatever would happen to MasterMind following an injunction, and so this element also favors the AI Defendants.

### D. Issuing an injunction would not be adverse to the public interest.

Under the last element of the preliminary injunction analysis, issuing an injunction would not be adverse to the public interest. The law disfavors extortion attempts like the ones MasterMind has made and continues to make against the AI Defendants. *See River Servs.*, 2017 WL 1407894, at *3 ("An injunction requiring the transfer of Plaintiffs' websites will in no way disserve the public interest."). Instead it favors utilizing the judicial forum and process to settle legal disputes – a

---

[3] The AI Defendants in no way concede the merits of MasterMind's claims, and to the contrary, intend to vigorously defend against them.

process which the AI Defendants are willing to participate in. This element therefore further counsels in favor of an injunction.

## CONCLUSION

In light of the foregoing, the AI Defendants respectfully request that the Court enter an injunction ordering MasterMind to immediately transfer back to the AI Defendants the passwords, administrative rights, and any other information necessary to enable the AI Defendants to login, access, and control their social media accounts, including but not limited to their local campus accounts and the national accounts with Instagram and Twitter.

In the event the Court believes it would be helpful to understanding the issues and the parties' positions, counsel for the AI Defendants are available to attend a hearing on any date convenient to the Court.

Respectfully submitted this the 10th day of June 2019.

> */s/ Alexander B. Feinberg*
> Alexander B. Feinberg (Georgia Bar No. 956505)
> **MAYNARD, COOPER & GALE, P.C.**
> 1901 Sixth Avenue North
> 2400 Regions/Harbert Plaza
> Birmingham, Alabama 35203-2602
> (205) 254-1000
> (205) 254-1999 (fax)
> afeinberg@maynardcooper.com
>
> *Attorney for the AI Defendants*

## **CERTIFICATE OF COMPLIANCE AS TO FONT SIZE**

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing complies with the font and point selections approved by the Court in Local Rule 5.1C.  The foregoing was prepared on computer using Times New Roman font (14 point).

This 10th day of June 2019.

*/s/ Alenxander B. Feinberg*
Alexander B. Feinberg
Georgia Bar No. 956505

*Attorney for AI Defendants*

Alexander B. Feinberg
**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203-2602
(205) 254-1000
(205) 254-1999 (fax)
afeinberg@maynardcooper.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of June, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which served notice of this electronic filing upon the following:

> Mathew A. Schuh
> Two Midtown Plaza, Suite 1350
> 1349 West Peachtree Street
> Atlanta, Georgia 30309
> (404) 277-8421
> matt@schuhpc.com
>
> *Attorney for Plaintiff*

/s/ Alexander B. Feinberg
OF COUNSEL