# EXHIBIT 1

## Declaration of Rebecca Adams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MASTERMIND INVOLVEMENT MARKETING, INC.,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**THE ART INSTITUTE OF ATLANTA, LLC, et al.** )<br>)<br>)<br>**Defendants.** ) | **CASE NO.: 1:19-CV-00839-TWT** |

## DECLARATION OF REBECCA ADAMS

My name is Rebecca Adams.  I am over the age of twenty-one and I have personal knowledge of the facts and statements made herein:

1.  I am the social media marketing manager and have been with our schools since 2010. I run all social media, specifically focused on organic social media for all of our many local and national channels (Facebook, Instagram, Twitter, LinkedIn, YouTube are our primary used channels), event coverage at the local campus level, content creation, oversee paid social ads on all channels (reply to all comments and direct messages), monitoring all channels and national social listening, (replying to messages, comments, problem solving, and engagement), training and overseeing my team of now 16 campus specific social media managers.

2.  I have a BA in Communications with a minor in English from Bowling Green State University (2004), was also collegiate athlete while attending, lacrosse, 2000-2004. I also have my master's degree in education.

**The AI Defendants and Their Social Media Accounts**

3.  The AI Defendants are eight post-secondary educational institutions offering masters, bachelors, and associate degrees in visual, creative, applied, and culinary arts. The schools are located in Atlanta, Austin, Dallas, Houston, San Antonio, Tampa, Virginia Beach, and Miami, respectively.

4.  Each of the AI Defendants has its own "local" campus account on various social media platforms. These platforms include Facebook, Instagram, and Twitter.

5.  The Art Institutes also has "national" social media accounts (i.e., accounts not specific to any one campus) on Facebook, Instagram, Twitter, Snapchat, Pinterest, LinkedIn, and YouTube.

6.  In total, the AI Defendants collectively have over 30 social media accounts on more than 8 different platforms.

7.  "Posting" news updates, advertisements, and other marketing materials on the social media accounts is the primary method by which the AI Defendants market and advertise their schools and attract new customers (i.e., prospective students). The AI Defendants also interact with prospective and current students through messaging services within the social media platforms. The AI Defendants

ability to generate revenue and succeed as a business enterprise depends heavily on their ability to connect with prospective customers through social media outreach efforts.

8.  The various methods and practices that the AI Defendants adhere to when choosing what content to post on their social media accounts have been internally developed over many years and are memorialized in internal policies and procedures, which are confidential. They have also been developed with assistance from third parties hired to provide guidance on such matters. These methods and practices are immensely valuable to the AI Defendants when put to use.

**MasterMind Is Hired to Manage the AI Defendants' Social Media Accounts**

9.  In or around February 2018, the then-parent company of the AI Defendants, DCEH, hired MasterMind to manage the AI Defendants' social media accounts. MasterMind was hired on the basis of its purported expertise in social media account management. Under the Master Services Agreement, which governed the services MasterMind would perform, MasterMind acquired full and unfettered access to the AI Defendants' social media accounts on several different platforms, such as their accounts on Facebook, Instagram, Twitter, Snapchat, and Pinterest, among others. Among other services, MasterMind's responsibilities included "posting" to the accounts on a daily basis. A true and correct copy of the Master Services Agreement is attached hereto as **Exhibit A**.

10. MasterMind shared access to the accounts with DCEH employees and the AI Defendants' employees. These employees could log in to any of the accounts at any time in order to post news updates and advertisements, respond to customer inquiries, and do anything else necessary to maintain the relevancy of the accounts' profiles.

11. In connection with the services it was performing for the AI Defendants, MasterMind recommended, and the AI Defendants agreed on the basis of MasterMind's purported expertise in the field, to let MasterMind store the passwords to the social media accounts in MasterMind's own software program, known a "Last Pass," which MasterMind recommended to the AI Defendants as a better and more secure location than where the passwords were previously being stored.

**MasterMind Withholds the AI Defendants' Accounts' Passwords**

12. In January 2019, DCEH sold the AI Defendants to Education Principle Foundation ("EPF"). As part of that larger transaction, DCEH also sold the ownership rights for the AI Defendants' social media accounts to Art Institute International, LLC ("AII"). AII, at this same time, entered into a services agreement with Studio Enterprises Manager, LLC ("Studio") under which Studio would, among other things, manage and control the AI Defendants' various social media accounts.

13. Following the January 2019 transaction, DCEH entered into receivership. After learning of the sale and DCEH's receivership, MasterMind soon stopped posting on the accounts and refused to give the AI Defendants and AII the passwords and/or administrative rights needed to login in order to prevent them from accessing the accounts. MasterMind likewise began changing the passwords and/or administrative rights to the accounts.

14. Since January 2019, the AI Defendants have not had access to their social media accounts because MasterMind has changed the passwords and/or administrative rights to the accounts, and has not informed the AI Defendants of the new passwords and/or administrative rights, despite repeated requests. The AI Defendants therefore have been unable to perform the day-to-day marketing and advertising necessary to maintain the relevancy of their brand and online profile that is integral to attracting new students.

15. Listed below, by AI Defendant/school, are the social media accounts that the AI Defendants cannot access because MasterMind has changed the passwords and/or administrative rights:

    a. The Art Institutes – National Accounts

        i. Instagram and Twitter

    b. The Art Institute of Atlanta, LLC

        i. Instagram and Twitter

   c.  The Art Institute of Austin, Inc.

       i.  Instagram and Twitter

   d.  The Art Institute of Dallas, Inc.

       i.  Instagram and Twitter

   e.  The Art Institute of Houston, LLC

       i.  Instagram and Twitter

   f.  The Art Institute of San Antonio, Inc.

       i.  Instagram and Twitter

   g.  The Art Institute of Tampa, Inc.

       i.  Instagram and Twitter

   h.  The Art Institute of Virginia Beach, LLC

       i.  Instagram and Twitter

   i.  Miami International University of Art & Design, Inc.

       i.  Instagram and Twitter

16.Enrollment at each of the AI Defendants has declined since mid-January 2019, in large part due to the inability of the AI Defendants to market and advertise their schools online and engage with postings/comments/ questions and direct or private messages from prospects.

I was provided an opportunity to review this Declaration and given the opportunity to make any and all necessary changes.  I make the above statement on penalty of perjury in accordance with 28 U.S.C. § 1746.

Dated this 7th day of June, 2019

Rebecca Adams

# EXHIBIT A
# TO DECLARATION OF
# REBECCA ADAMS

# Master Services Agreement



**MASTER SERVICES AGREEMENT**

This Services Agreement (the "Agreement") is entered into effective as of Insert Date (the "Effective Date") by and between Dream Center Education Holdings, LLC with its principal place of business located at the address set forth on the signature page ("DCEH") and MasterMind Involvement Marketing with its principal place of business located at the address set forth on the signature page ("Vendor") and shall remain in effect until terminated in accordance with the terms and conditions set forth herein.

## 1. Performance of Services

1.1. Vendor shall diligently perform services for the benefit of DCEH as the parties may agree to from time to time (the "Services"). The Services will be provided in accordance with written Statements of Work (hereinafter, "SOW" or "SOWs") agreed to between the parties, and in full compliance with the highest standard of practice in the industry. DCEH and Vendor shall jointly determine and identify each party's roles for each set of Services set forth in an SOW. Each SOW will be executed by an authorized representative of each party, whereupon it shall be deemed incorporated herein by reference as though fully set forth herein. Vendor shall comply with all applicable laws and DCEH security and safety rules in the course of performing Services hereunder. If Vendor's work requires a license, Vendor warrants and agrees that it has obtained that license at its own cost and that the license is, and throughout the term of this Agreement shall remain, in full force and effect.

1.2. Vendor shall complete the Services in accordance with the timeframe(s) set forth in an SOW. This Agreement, including any SOWs shall be attached to the purchase order. It is further agreed that Vendor is expected to deliver work described in such SOW .

1.3. In furtherance of the Services, each of Vendor and DCEH will provide such materials and/or tools as are specified in an SOW hereto. Vendor shall provide all materials and equipment required to complete the Services including telephone, fax machine and computer equipment.

## 2. Report Requirements

2.1. Vendor will report to the DCEH employee designated in an SOW, who is authorized to monitor the progress of Vendor in performing the tasks specified in an SOW, to obtain approval of invoices submitted by Vendor and to provide technical liaison between Vendor and DCEH (the "DCEH Project Lead"). Such reports by Vendor shall be made with such frequency and detail as may reasonably be required by the DCEH Project Lead.

2.2. DCEH shall, until the expiration of three (3) years after final payment under this Agreement, have access to and the right to examine any directly pertinent books, documents, papers and records of Vendor involving transactions related to this Agreement.

## 3. Compensation

3.1. Vendor shall keep accurate records of time expended in performing the Services hereunder, which records shall at all times be available for inspection and copying by DCEH at any time during normal business hours upon reasonable prior notice. All invoices must be submitted by Vendor to the attention of DCEH' Accounts Payable department, and any such invoices shall state time expended by Vendor, identify any other authorized expenses and make reference to this Agreement and the purchase order number.

3.2. Maximum compensation to Vendor shall in no event exceed the amount indicated on an SOW hereto unless pre-approved by DCEH in writing. If any travel or related expenses are required to perform the Services, such expenses must be pre-approved by DCEH in writing and must be in accordance with DCEH travel and expense guidelines, which shall be provided to Vendor.

3.3. Vendor shall invoice DCEH only for deliverables and/or time devoted directly to the actual performance of the Services indicated in an SOW. Vendor shall receive no compensation for time spent commuting.

3.4. Invoices must be submitted by Vendor for payment upon dates agreed to in an SOW along with receipts for any client approved out-of-pocket



**MASTER SERVICES AGREEMENT**

expenses approved by client and with accompanying supporting documentation. Terms of payment are net 30(Thirty) days after receipt by DCEH Accounts Payable department.

3.5. DCEH shall not be liable for any federal, state, or local withholding, national insurance contributions or other payroll taxes relating to performance of services by the Vendor under this Agreement.

3.6. Vendor acknowledges and agrees that it is being paid to invent and create and its compensation includes payment for such inventions and creations indicated in approved SOWs. Vendor further agrees that it shall not assert any moral rights in its works under this Agreement in any country and signature of this Agreement constitutes an unconditional and irrevocable waiver of all such moral rights that may arise.

3.7. Vendor shall be solely responsible for all expenses of performance hereunder except to the extent otherwise expressly provided in an SOW.

4. **Independent Contractor**

4.1. Vendor, is and shall remain an independent contractor and not an employee of DCEH. Vendor, and not DCEH, shall have control over the method, manner and means of Vendor's performance of the Services, subject to the express provisions of this Agreement.

4.2. Except as specifically provided in this Agreement, nothing in this Agreement shall either render, or be interpreted or construed to mean, that the parties are partners, joint venturers, trustee/beneficiary, employer/employee or principal/agent of the other. Except as specifically provided in this Agreement, neither party shall have any authority whatsoever to obligate or commit the other party, contractually or otherwise, and neither party shall do anything whatsoever to represent to any person that they have any authority to so obligate or commit the other party.

4.3. Vendor shall be solely responsible for such insurance coverage as Vendor deems necessary to protect it against any form of insurable risks. However, at a minimum, Vendor shall procure and

maintain for the duration of the contract insurance against claims for injuries to persons or damages to property that may arise from or in connection with products and services supplied to DCEH in accordance with the requirements set forth on Exhibit A. The cost of such insurance shall be borne by the Vendor, unless otherwise specified. Insurance is to be placed with insurance carriers that have an A.M. Best rating of A-VII or better**.**

4.4. Neither Vendor nor any of its employees or contractors shall be entitled to any benefits accruing to DCEH employees generally. DCEH shall not deduct from Vendor's compensation nor in any manner pay for those charges which are normally paid on behalf of an employee, including, but not limited to, worker's compensation insurance, income tax withholdings, health insurance, worker's holiday pay, sick pay or pension provision. DCEH shall not be required to hire, supervise or pay any assistants to help the Vendor. Vendor hereby agrees to indemnify and to hold DCEH harmless for any and all claims, losses, liabilities or costs (including attorney's fees) based upon any assertion that Vendor or any of its employees are employees of DCEH.

4.5. Vendor may, at its sole discretion and at its expense, make use of the services of its own employees in providing the Services.

4.6. Vendor hereby acknowledges that it has no authority to enter into, and Vendor hereby agrees not to enter into, any contract, incur any liability, or otherwise act on behalf of DCEH. Nothing in this Agreement shall be construed to imply that Vendor is an agent, employee, or other representative of DCEH, nor shall Vendor make any representations to the contrary.

4.7. Vendor represents warrants and covenants that:

(a) Vendor shall at all times perform his obligations and activities under this Agreement through lawful and proper methods, with reference to the laws and regulations of the United States and the laws and regulations of any other applicable jurisdiction(s) in which Vendor performs its said obligations and activities;



**MASTER SERVICES AGREEMENT**

(b) Vendor is not an Official and none of its officers, directors, or employees is an Official or a member of the immediate family of, or financially dependent on, an Official;

(c) No Official is directly or indirectly a principal owner or investor in Vendor and that no Official has any substantial financial interest in the contractual relationship established by this Agreement;

(d) Vendor has not and shall not offer or make, directly or indirectly, any improper payments of money or anything of value to an Official in connection with this Agreement and has not, and shall not offer or make, directly or indirectly, any payments to a third party knowing, or suspecting, that the third party will use all or any portion of it to make any improper payment to any Official;

(e) Vendor has received (and has or will promptly obtain at its expense on behalf of Company) whatever government registrations, licenses and approvals that may be required by law or regulations in order to enable lawful performance under this Agreement (including any SOW); and

(f) Except as otherwise disclosed to Company in writing prior to entering into this Agreement or any affected SOW, Vendor knows of no registration or reporting requirement applicable to Company by virtue of its entering into this Agreement or any SOW hereunder or the furnishing of consideration to Vendor in respect of services performed or to be performed.

For purposes of this Section, the term "Official" shall include any appointed, elected, or honorary official or any career employee of the government of the jurisdiction in which Vendor will perform its obligations and activities under this Agreement, or of a public international organization. The "government" includes any agency, department, embassy or other governmental entity. It also includes any company or other entity controlled by the government. A person does not cease to be a government official by purporting to act in a private capacity or by the fact that he or she serves without compensation.

4.8.   Subject to the Vendor's due compliance with the terms of this Agreement, Vendor shall be free to provide services to any other person, firm, company or other organization.

4.9.   Security Background Check. Without limiting the provisions of Section 1. above, if the Services require that Vendor and its employees and agents have unescorted access to DCEH's premises through the use of a badge, before any such badge is issued, the individual who requires such access shall complete DCEH's then applicable "Contractor/Consultant Access Form" and submit to a background check which shall verify, among other things, the individual's social security number, criminal history and driving record. In some sites, the individual may also be required to submit to a drug test before a badge is issued. Further, in some sites the individual may also be required to demonstrate proof of training or take DCEH training for certain types of badges. Such requirements will be specified in the applicable Statement of Work. DCEH reserves the right to limit Vendor's or its employees' or agents' access to the premises contingent upon the outcome of any applicable background check or drug test. At any time, DCEH may request any such person to leave DCEH's premises, and such person shall promptly comply with such request.

5.   **Nondisclosure and Privacy**

5.1.   At all times during and subsequent to the term of this Agreement, Vendor agrees to keep in strictest confidence and trust all Confidential Information and to take all reasonable precautions to protect against its disclosure or misuse. Without prior written consent of DCEH, Vendor will neither use any Confidential Information other than for the sole benefit of DCEH for performance of Vendor's duties in connection with the Services, nor disclose any Confidential Information except to employees of DCEH (or of Vendor) with a need to know for purposes of performing the Services. Vendor shall not, however, be required to treat as confidential any of the Confidential Information which Vendor establishes by written evidence: (i) is in the public domain by reason of prior publication not directly or indirectly resulting from any act or omission of Vendor or its employees or permitted subcontractors, or (ii) was already properly known to Vendor (other than in connection with this Agreement) without restriction on use or


Education Management Corporation

**MASTER SERVICES AGREEMENT**

disclosure at the time of DCEH' disclosure to Vendor. Vendor understands that the arrangement contemplated by this Agreement creates a relationship of confidence and trust between Vendor and DCEH with regard to Confidential Information.

5.2. Vendor agrees that all written and descriptive material, including notes and drawings, however embodied or fixed, received or made by Vendor and its employees and agents in connection with the Services performed under this Agreement and approved SOW or in connection with any Inventions or Confidential Information belonging to DCEH, shall be and are the sole and exclusive property of DCEH. Vendor shall return all such materials to DCEH upon request, but in any event upon any termination of this Agreement.

5.3. Vendor shall not disclose in any manner the nature of the Services to be performed under this Agreement, the terms of this Agreement, or the fact that Vendor has entered into an agreement with DCEH, unless specifically authorized by DCEH or unless required to perform the Services specified herein.

5.4. Vendor shall take all appropriate measures to ensure that its employees who perform Services in connection with this Agreement are competent and that they comply with this Section 5 and with Section 6 below as though they were bound under this Agreement directly to DCEH. Vendor shall also require all such employees to enter into nondisclosure agreements covering any Confidential Information as defined herein and imposing upon such employees restrictions on use and non-disclosure duties no less stringent than those set forth in this Agreement.

5.5. Vendor will not disclose to DCEH, use in connection with performance of the Services or induce DCEH to use any trade secret or other confidential information belonging to any third party without such third party's prior written consent.

5.6. "Confidential Information" means any information, data, business plans, technical specifications, product information, software code (including source code), trade secrets or know how disclosed or made available previously or during the term of this Agreement by DCEH to Vendor and/or its employees or agents, either directly or indirectly, in

writing, by electronic means, orally or by inspection of tangible objects (including without limitation documents, prototypes, samples, plants or equipment), which is designated as "Confidential", "Proprietary" or some similar designation, Confidential Information also includes:

5.6.1. information which by its nature and the circumstances of its disclosure the Vendor or its employees or agents should reasonably infer to be confidential or proprietary;

5.6.2. any Inventions;

5.6.3. information relating to DCEH', its customers', suppliers' or partners' employees or contractors;;

5.6.4. compilations of data or information concerning DCEH' business, strategy, plans or financial results;

5.6.5. the identities and information of DCEH' licensors, licensees, suppliers and customers and the nature of DCEH' relationships with these licensors, licensees, suppliers or customers;

5.6.6. category specific ;

5.6.7. confidential, proprietary or trade secret information submitted by any third party to DCEH for study, evaluation or any other use; and

5.6.8. any other information not generally known to the public (including information about DCEH' operations, personnel, products or services) which, if misused or disclosed, could adversely affect the business of DCEH.

5.7. Privacy.

5.7.1 Vendor shall at all times comply with all privacy and data protection laws and regulations applicable to it and the Services, and Vendor shall protect any personal information that it receives under this Agreement and any associated SOWs in compliance with such laws. Vendor shall use any personal information that it receives in connection with this Agreement only for purposes that are directly necessary to perform its obligations hereunder, and shall not use such information for any other purpose. Vendor shall not damage, alter, lose or destroy any personal information provided hereunder, and shall not disclose, sell, lease, or provide access to such personal information to any third party unless

DocuSign Envelope ID: E81E2E2D-1A0B-43C5-9265-5F7EF25EBC2A


Education Management Corporation

**MASTER SERVICES AGREEMENT**

expressly agreed to by DCEH in an executed agreement. Vendor shall (and shall obligate its employees, contractors, and subcontractors to) maintain reasonable technical and organizational measures to maintain security, prevent unauthorized or unlawful access to, or processing of, personal information and accidental loss or destruction of, or damage to, personal information.

5.7.2 Vendor shall give DCEH prompt written notice as soon as Vendor becomes aware of any breach of its privacy and data protection obligations under this Agreement or of any enforcement proceeding against it under any applicable laws or regulations regarding privacy and information protection.

5.7.3 Vendor shall indemnify and hold harmless, DCEH and its directors, officers, affiliates and employees ("Indemnitees") for any third-party claims for damages and/or losses suffered as a result of the breach by Vendor of its obligations with respect to the confidentiality and privacy of any personal or Confidential Information as set forth in this Agreement, and Vendor shall pay all damages, actual expenses and costs (including reasonable attorneys' fees) incurred by the Indemnitees as a result of such claim. Each party shall promptly provide to the party defending the claim (i) written notice of any claim, (ii) copies of all communications relating to a claim and (iii) reasonable cooperation in the defense.

5.8. Vendor's obligations under this section shall survive any termination of this Agreement.

6. **Inventions**

6.1. Vendor agrees that all discoveries, developments, designs, improvements, inventions, formulae, processes, techniques, algorithms, designs, computer programs, strategies, specific technical know-how, and data, whether or not patentable or registrable under patent, copyright or similar statutes, that are generated, created, conceived, reduced to practice or learned (collectively "created") by Vendor and its employees and agents (or anyone acting on Vendor's behalf), either alone or jointly with others and either (i) result from any work performed by the Vendor that are the subject of any SOW approved by DCEH, or (ii) are created in whole or in part with the use of DCEH' equipment, supplies, facilities or

Confidential Information, during the period of this Agreement which relate in any manner to the subject of any SOW approved by("Inventions") are the sole property of DCEH provided that DCEH has complied with all terms in the SOW. "Inventions" include all deliverables or results of Vendor's work under any approved SOW and documentation of such work During the term of this Agreement, Vendor will promptly and fully disclose to DCEH (and to any persons designated by it) all Inventions relating to work for any approved SOW. DCEH shall be the sole owner of all rights (including, without limitation, all rights in patents, design rights, registered designs, topography rights and utility models, copyrights, database rights, know-how, mask works, trademarks, trade or business names (including all goodwill associated with any trademarks or trade and business names), rights in the nature of unfair competition rights and to sue for passing off and rights in trade secrets and other confidential information and all other intellectual property rights and other forms of protection of a similar nature or having equivalent or similar effect to any of those that may subsist anywhere in the world (all such rights including the benefit of all registrations of, applications to register and the right to apply for registration of any of the foregoing items, including any extension or renewals thereof) ("Intellectual Property Rights")) in any and all Inventions. In consideration of the sums payable to Vendor under this Agreement, Vendor hereby further agrees to assign (or cause to be assigned) and does hereby assign to DCEH with full title guarantee, all Inventions including any Intellectual Property Rights relating thereto (which shall include any future Intellectual Property Rights).

6.2. All works of authorship furnished by Vendor in any form under this Agreement shall constitute the original works of Vendor unless so noted as purchased for DCEH, and no such work product (and no portion thereof) shall be a derivative work based in whole or in part on any third party Intellectual Property (including copyright works) unless so noted. Vendor agrees that all works of authorship will be "works made for hire" to the extent allowed by law for any approved SOW.

6.3. Vendor agrees to assist DCEH, or its designee, at DCEH' expense, in every proper way to secure DCEH' rights in any Inventions and any Intellectual Property Rights relating thereto in any and



**MASTER SERVICES AGREEMENT**

all countries, including the disclosure to DCEH of any and all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that DCEH may deem necessary in order to apply for and obtain such rights and in order to assign and convey to DCEH, its successors, assigns and nominees the sole and exclusive right, title and interest in and to such Inventions and any Intellectual Property Rights relating thereto. Assistance may be predicated on DCEH approving an SOW to compensate Vendor for level of effort beyond customary transfer documents.

6.4. Without prejudice to Section 6.2, if any Inventions assigned hereunder are based on, or incorporate, or are improvements or derivatives of, or cannot be reasonably made, used, reproduced and distributed without using or violating Intellectual Property Rights not assigned hereunder, Vendor hereby grants to DCEH a perpetual, worldwide, royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such Intellectual Property Rights in support of DCEH' exercise or exploitation of any Inventions (including any modifications, improvements and derivatives thereof) unless DCEH were made aware that such improvements and derivatives were not available at the time the Vendor's work was presented to DCEH as part of an approved SOW.

6.5. Vendor agrees that if DCEH is unable, because of Vendor's unavailability, dissolution, mental or physical incapacity or any other reason, to secure Vendor's signature to apply for or pursue any applications for any registrations or Intellectual Property Rights anywhere in the world (including patents, mask works or copyright registrations) covering the Inventions assigned to DCEH, then Vendor hereby irrevocably designates and appoints DCEH and its duly authorized officers and agents as Vendor's agent and attorney-in-fact to act for and in Vendor's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of such Intellectual Property Rights with the same legal force and effect as if executed by Vendor.

6.6. Vendor's obligations under this section shall survive any termination of this Agreement.

7. **Term and Termination**

7.1. This Agreement and/or any SOW hereunder may be terminated by DCEH or vendor upon thirty (30) calendar days advance written notice, WITH OR WITHOUT CAUSE, in which case Vendor shall be entitled to compensation for billable hours actually spent and all approved SOWs on work under this Agreement (but in no event shall aggregate compensation exceed the amount specified in an SOW(s) that is in effect at the time of termination).

7.2. If at any time Vendor fails strictly to adhere to its obligations under this Agreement, DCEH may at any time terminate this Agreement immediately upon 30 days written notice if Vendor cannot or does not cure any breach noted in the written notice.

7.3. Vendor may terminate this Agreement and/or any SOW if DCEH materially breaches the same and fails to cure such breach within thirty (30) calendar days after receipt of written notice reasonably describing the breach.

7.4. If not sooner terminated under or, above, this Agreement shall terminate three (3) years from the Effective Date.

7.5. Upon any termination of this Agreement, DCEH shall have 30 days in which to make payment to Vendor for any amounts then owing in accordance to the terms herein.

7.6. Sections 4, 5, 6, 7, 8, 9, 11 and 12 of this Agreement shall continue in effect after termination of this Agreement.

8. **Security and Safety**

In the course of providing services to DCEH during the term of this Agreement, Vendor shall comply with (and shall require its employees authorized agents and subcontractors to comply with): (a) all applicable laws, and (b) all applicable DCEH security and safety rules and policies, including, without limitation, DCEH policies with respect to network access and information security. Notwithstanding the foregoing, Vendor shall restrict access to all data provided by DCEH under this agreement solely to those employees of Vendor who have a need to access such data solely for the purpose of performing services or obligations

DocuSign Envelope ID: E815252D-1A0B-43CE-9265-EF7FF25EBC2A


Education Management Corporation

**MASTER SERVICES AGREEMENT**

in accordance with this Agreement. Vendor shall also provide DCEH with prompt written notice of any suspected or actual violation of such laws, rules or policies or breach of any terms of this agreement, including, without limitation, any suspected or actual breach of Vendor's network by a third party that may or did result in the exposure to any third party of information owned, licensed or provided by DCEH to Vendor, its employees, authorized agents or subcontractors and/or their respective systems in connection with this agreement. Vendor shall be liable for, and shall indemnify and hold harmless DCEH for, any damages that result from Vendor's failure to comply with its obligations under this section. DCEH shall have the right to audit Vendor's compliance with this section, provided Vendor is given at least three (3) days advance notice of any such audit and that such audit is conducted in a reasonable manner that seeks to minimize disruption to Vendor's business operations. Vendor agrees that it will cooperate with the reasonable requests of DCEH and its agents in connection with any such audit, which shall include providing DCEH and its agents with relevant documents, information (including network logs, access controls, and identities of personnel under the control of Vendor with access to DCEH data), and electronic records as requested by DCEH as well as providing DCEH or its agents with access to relevant facilities, systems and personnel. Each party shall bear its own costs in connection with any such audit, provided that DCEH shall bear the costs of any third party it may choose to engage to assist in the performance of such audit. This right to audit shall survive termination of this agreement for a period of one (1) year.

9. **Conflicting Obligations**

Vendor certifies that there are no outstanding agreements or obligations that are in conflict with the terms of this Agreement, or that would preclude Vendor from complying with the provisions hereof.

10. **Warranties and Indemnification**

10.1 Where materials, parts and supplies are furnished under a SOW, Vendor shall, to the extent legally permitted, provide and pass through to DCEH the warranty, if any, which is provided by the manufacturer or supplier of such materials, parts and/or supplies.

10.2 Vendor warrants that Services provided by Vendor will be performed with reasonable skill and care in accordance with industry standards. For any breach of this warranty reported to Vendor within sixty days (60) after completion of the Services or the failure of Vendor to perform the services, Vendor shall, promptly perform, correct or re-perform those Services.

10.3 Vendor shall indemnify, defend and hold harmless DCEH and its directors, officers, employees and agents from and against any actual or threatened loss, liability, damage, claim, demand or suit (including related expenses and attorney's fees) incurred in connection with Vendor's performance of the Services, including, without limitation, claims that the Services infringe the intellectual property rights of any third party. DCEH will notify Vendor of any actual or threatened actions within 5 days of learning of such for this indemnification.

11. **Code of Conduct**

Vendor has read, understands, will abide by and will cause its applicable employees to abide by DCEH Code of Conduct for Contract Workers, Vendors, Consultants and Independent Contractors ("the Code") while performing this Agreement. The Code is attached hereto and incorporated herein as Exhibit B.

12. **Miscellaneous**

The parties acknowledge that the Services to be performed are unique and personal to the parties, hence no rights herein may be assigned or otherwise transferred or subcontracted without the express written consent of the other party, except that DCEH and Vendor may assign this Agreement to a direct or indirect parent or subsidiary, and may also assign this Agreement to a successor entity by means or merger or acquisition without consent of Vendor. Furthermore, notwithstanding any other provisions of the Agreement, if a valid assignment by DCEH occurs, DCEH is permitted to use the Services during a transition of services time period agreed on between DCEH and its assignee at no additional fee.

12.1. Section headings and titles are for convenience only and shall be of no force or effect in the construction or interpretation of this Agreement.


Education Management Corporation

**MASTER SERVICES AGREEMENT**

12.2. This Agreement, including all SOWs, expresses the complete and exclusive statement of the understanding between the parties regarding the subject matter herein and supersedes any prior or contemporaneous written or oral proposals and agreements, representations or courses of dealing. Any modification to this Agreement must be in writing and signed by an authorized officer of DCEH and by an authorized officer of Vendor.

12.3. If any terms of this Agreement are deemed to be unenforceable by a court of competent jurisdiction, then such term shall be deemed deleted. The remaining terms shall be construed so as to give maximum lawful effect to any such deleted terms.

12.4. No waiver by either party of any breach of any provision of this Agreement shall constitute a waiver of any other breach of that or any other provision of this Agreement.

12.5. In the course of performing the Services, Vendor agrees to comply with all applicable export, import and technology control laws and regulations. Without limiting the foregoing, Vendor agrees, both during the term of this Agreement and thereafter, not to export any technical data or other material received or generated by Vendor in the course of performing Services under this Agreement without complying with all applicable export control laws and regulations.

12.6. This Agreement shall be construed in accordance with the laws of the state of Pennsylvania (excluding its conflict of laws and the U.N. Convention on Contracts for the International Sale of Goods).

12.7. This Agreement may be executed in counterparts, each of which so executed will be

deemed to be an original and such counterparts together will constitute one and the same Agreement.

12.8. Except as otherwise provided in this Agreement, neither party grants the other party any rights to use its trademarks, service marks, or other proprietary symbols or designations.

12.9. Vendor shall not issue any written press release or otherwise publicize the existence of this Agreement or any SOW without the prior written consent of DCEH.

12.10. Neither party will be responsible for any failure or delay in its performance due to causes beyond its reasonable control, including, but not limited to, acts of God, war, riot, embargoes, acts of civil or military authorities, fire, floods, earthquakes, accidents, strikes, or fuel crises ("Force Majeure"), provided that such party gives prompt written notice thereof to the other party and uses its diligent efforts to resume performance. Either Party shall be entitled to terminate this Agreement if the Force Majeure event continues for a period of 1 (one) month.

12.11. Any notices, requests, or demands required or permitted herein, be in writing and mailed to the addresses set forth below and provided however that either party may change its address by written notice to the other party.

If to Vendor:     To the address and contact listed on the signature page hereto.

If to DCEH:      DREAM CENTER EDUCATION HOLDINGS, LLC
Attn.: Legal Department
1400 Penn Avenue
Pittsburgh, PA 15222



**MASTER SERVICES AGREEMENT**

The undersigned parties have caused this agreement to be duly executed as of the date above first written.

**<u>Vendor</u>**

By: _____

Name: Mike Gelford

Title: EVP

Address:
1450 West Peachtree Street NW, Atlanta, GA 30309

Date: Feb 28, 2018

**<u>DREAM CENTER EDUCATION HOLDINGS, LLC</u>**

By: _____

Name: Chad Garrett

Title: _____

Address:
1400 Penn Avenue, Pittsburgh, PA 15222

Date: Feb 27, 2018



**MASTER SERVICES AGREEMENT**

**EXHIBIT A**
**INSURANCE**

Vendor shall at all times during the term of this Agreement maintain the following:

1. **Workers' Compensation and Employer's Liability Insurance.**  Workers' compensation insurance shall be provided as required by law or regulation.  Employers Liability insurance with minimum limits of $1,000,000.00 per accident for bodily injury by Accident; $1,000,000.00 policy limit by disease; and $1,000,000.00 for bodily injury by disease, each employee.

2. **General Liability Insurance.**  Vendor shall carry a Commercial General Liability (Occurrence) policy with minimum limits of the following:

   - $1,000,000.00 each occurrence;
   - $2,000,000.00 Aggregate for Products and Completed Operations;
   - $1,000,000.00 Advertising and Personal Injury;
   - $2,000,000.00 General Aggregate

3. **Automobile Insurance.**  Vendor shall carry bodily injury & property damage coverage with minimum limits of $1,000,000.00, for all owned, hired and non-owned autos.

4. **Errors and Omissions.**  Vendor shall carry Professional Errors and Omissions Insurance with the minimum limit of $2,000,000.00 for each occurrence.

5. **Excess Liability Policy.**  The insurance limits required in this Agreement may be obtained through any combination of primary and excess liability insurance.  Any excess liability policies shall provide umbrella coverage to cover in the same manner as the Employer's Liability Policy, Commercial General Liability Policy, Business Automobile Liability Policy and Errors and Omissions Policy, and shall not contain any additional exclusions or limitations of such policies.

6. **Additional Requirements.**  The Vendor's insurance coverage shall be primary insurance as respects DCEH, its officers, officials, and employees.  Any insurance or self-insurance maintained by DCEH, its officers, officials, and employees shall be excess of and not contribute with the Vendor's insurance.  The insurer must be licensed to do business in the state in which the work is performed.   The Vendor shall agree to require all permitted subcontractors performing work under their agreement with DCEH or who may enter upon the work site to maintain the same insurance requirements listed above.  Vendor shall deliver a certificate of insurance naming DCEH, its officers, its employees, its subsidiaries and affiliates as additional insured, with respect to product or services performed under this Agreement.  Certificates of insurance must be provided to DCEH prior to any work being performed and must be kept in force during the term of this Agreement.  Each insurance policy will be endorsed to state that coverage shall not be suspended, voided, cancelled, reduced in coverage or in limits except after 30 days' prior written notice by certified mail, return receipt requested, has been given to DCEH.



**MASTER SERVICES AGREEMENT**

**EXHIBIT B**

**DCEH Code of Conduct**
**For Contract Workers, Vendors, Consultants and Independent Contractors**

The information contained in this Code is not a comprehensive, full or complete explanation of all of the policies, laws and regulations that may apply to you as a contract worker, vendor, consultant or independent contractor of DCEH. In the event that you discover a conflict of interest or events of a questionable, fraudulent or illegal nature, that are, or may be, in violation of the guidelines set forth in this Code, you should report the matter immediately to a member of DCEH's Concerns Committee or directly to a member of the Audit Committee of the Board of Directors, whose contact information can be found on DCEH's intranet site. You may also report the matter on a confidential (and, at your choice, anonymous) basis through DCEH's Ethics Helpline or by calling them toll-free at +1 (888) ???-????. No discrimination or retaliation against any person who, in good faith, reports such concerns will be tolerated. Any violation of this Code will result in disciplinary action up to and including termination of your status as an DCEH contract worker, vendor, consultant or independent contractor.

During the course of performing of services for DCEH:

1. Do not bring weapons, or anything that could be construed as a weapon, to an DCEH facility.

2. Do not engage in physical violence or verbal abuse.

3. Do not perform services for DCEH while under the influence of any substance, including drugs or alcohol, which prevents you from providing services safely and effectively.

4. Follow DCEH policies with respect to your physical access to DCEH sites.

5. Care for computer or other equipment provided by DCEH, maintain its security and use it responsibly for DCEH's business purposes. Incidental use of the equipment for personal reasons should be kept to a minimum and must not interfere with DCEH's business or harm DCEH's reputation. If such equipment is used outside of DCEH's premises, take precautions to protect it (and information of DCEH and its customers) from theft, damage, misuse and destruction. All such equipment and any information contained in it must remain fully accessible to DCEH and remains DCEH property.

6. Do not engage in any type of harassment or discrimination including, but not limited to, harassment of a sexual, religious or gender-based nature.

7. Maintain accurate time reports, expense accounts and other personal records related to services you provide to DCEH.

8. Avoid conflicts of interest. Do not engage in any activity that would interfere with your job performance or responsibilities. You must disclose to DCEH any interest you have that may conflict with DCEH's business or that may be perceived as something that could compromise your responsibilities or ability to make impartial and objective decisions related to the services you are providing to DCEH. You must disclose to DCEH if you are employed by or doing any work for DCEH's direct competitors, including but not limited to _____, _____, _____, _____, _____, _____, _____, and _____.

9. Do not, under any circumstances while acting on behalf of DCEH, offer to pay, pay, or issue authorization to pay any money, gift, kickback or anything of value to customers, vendors, employees, government officials, etc.



**MASTER SERVICES AGREEMENT**

that is or could be perceived as intended, directly or indirectly, to improperly influence any business decision, any act or failure to act, any commission of fraud, or opportunity for the commission of any fraud or obtain any unfair competitive advantage or which would violate federal or state and local laws or regulations, including but not limited to the Foreign Corrupt Practices Act ("FCPA") and the U. S. Federal Procurement Integrity Act.. You must fully comply with any rules regarding tender and bid processes. You may not offer employment to foreign officials if doing so would violate local laws.

10. Exercise no control over DCEH funds and strictly follow DCEH procedures and policies for maintaining books, records and accounts, carrying out and reporting business transactions, obtaining the appropriate authorization from management for those transactions and retaining appropriate documentation.

11. In the event that you come into possession of significant, sensitive material information about DCEH or another company with which DCEH either has or is contemplating a relationship, you may not engage in insider trading by buying or selling securities yourself, or passing on the information to others to enable them to profit or for them to profit on your behalf.

12. Do not make any written or oral representations, commitments or agreements on DCEH's behalf (including product feature commitments) without prior written approval from DCEH.

13. Comply strictly with all applicable export and import laws and regulations and not export, re-export, transfer, divert, release, import or disclose any DCEH products or any direct product thereof, technical data relating to such products or DCEH confidential information to any other person or entity (nor shall you make any use thereof) except under license or as otherwise permitted under such laws and regulations.

14. Comply strictly with any confidentiality or non-disclosure obligations you have with DCEH and others.