## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **MASTERMIND INVOLVEMENT MARKETING, INC.,** | ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CASE NO.: 1:19-CV-00839-TWT** |
| **THE ART INSTITUTE OF ATLANTA, LLC, et al.** | ) ) ) | |
| **Defendants.** | ) | |

### REPLY BRIEF IN SUPPORT OF MOTION FOR
### PRELIMINARY INJUNCTION

The Art Institute of Atlanta, LLC, The Art Institute of Austin, Inc., The Art Institute of Dallas, Inc., The Art Institute of Houston, LLC, The Art Institute of San Antonio, Inc., The Art Institute of Tampa, Inc., The Art Institute of Virginia Beach, LLC, and Miami International University of Art & Design, Inc. (the "AI Defendants"), submit this reply brief in support of their Motion for Preliminary Injunction (D.E. 30) and in response to Plaintiff MasterMind Involvement Marketing, Inc.'s ("MasterMind") opposition to that motion (D.E. 35).

In further support of their motion, the AI Defendants submit the Declaration of Claude Brown, attached hereto as Exhibit 1 and the Supplemental Declaration of Rebecca Adams, attached hereto as Exhibit 2.

1

# INTRODUCTION

This Court should issue an injunction ordering MasterMind to give the disputed social media accounts and passwords back to their rightful owners – the AI Defendants, and more specifically, their parent company, The Arts Institutes International, LLC ("AII"). That is so for three reasons: *First*, AII undeniably owns these social media accounts and their passwords. If there was any doubt about that, the Brown Declaration, which details how AII acquired ownership rights in the accounts, should put it to rest. *Second*, the harm to the AI Defendants and AII from not being able to advertise through social media is great, and far outweighs the minimal burden that an injunction would impose upon MasterMind. While MasterMind suggests that the AI Defendants were not candid about their access to the accounts, the Supplemental Adams Declaration confirms that the AI Defendants have *no access* to most features of the Instagram and Twitter platforms, and only *limited access* to other features. *Third*, the few reported cases in this developing area of the law, cited in the AI Defendants' opening brief, all support this Court's *first* ordering MasterMind to transfer the passwords back to the AI Defendants, and *then* resolving the merits of MasterMind's claims in equity. Instead of addressing these authorities, MasterMind submits a novel theory of bailment law that is contrary to Georgia law, and in any event is contrary to the terms of the contract MasterMind entered. Ultimately, this argument, and others in MasterMind's brief, are meant to

distract the Court from the undisputed fact that MasterMind is withholding intellectual property that it concedes it does not own in an attempt to extort payment from the AI Defendants for services owed by their parent company's former owner. For these reasons and those discussed below, this Court should issue the requested injunction.

## I.   AII owns the social media accounts and passwords.

The disputed social media accounts and passwords are property owned by the AI Defendants' parent company, AII. Indeed, precisely because AII is the rightful owner, the AI Defendants filed a motion with the Court seeking to add AII as a counterclaim plaintiff. *See* D.E. 32, Motion for Joinder and for Leave to File Amended Answer and Counterclaims ("Motion for Joinder"). MasterMind, however, did not file a response to the Motion for Joinder by the deadline to do so. Moreover, MasterMind did not address AII's ownership rights in its opposition brief to the Motion for Preliminary Injunction. *See* D.E. 35.

Nevertheless, while MasterMind did not object to AII becoming a party, it still attempts to manufacture confusion over who owns the accounts by spending most of its brief complaining about complex corporate transactions, a bankruptcy with too many entities, and a receivership with too many docket entries. But AII's ownership in these accounts is clear, not complicated, and based on documentary evidence.

As set forth in detail in the Brown Declaration, the basis for AII's ownership of the accounts is as follows. AII is a non-profit, limited liability company that previously was owned by Education Management Corporation ("EDMC"). Brown Decl. at ¶¶4-5. In or around October 2017, EDMC sold AII to Dream Center Education Holdings, LLC ("DCEH"). *Id.* at ¶5. AII itself held at the time (and still holds today) the sole membership interest in the LLCs that operate the eight Art Institute schools that are defendants in this case. *Id.* at ¶¶6-7. Accordingly, following the consummation of the October 2017 transaction with EDMC, DCEH directly owned AII, and indirectly owned the AI Defendants. *Id.*

In February 2018, DCEH and MasterMind entered into a Master Services Agreement ("Agreement") and associated Statements of Work (each an "SOW"). *See* D.E. 30-1, Exhibit A (Agreement); D.E. 35-1, Exhibit E (Mar. 1, 2018 SOW) and Exhibit F (Aug. 15, 2018 SOW). The Agreement and SOWs contemplated that MasterMind's services would include "social media strategy, management and oversight across The Art Institutes, South University, Argosy University and Western State College of Law." D.E. 35-1, Exhibit F; *see also id.* (stating that the "budget covers the following ongoing daily activities and deliverables for the National social media channels of the aforementioned DCEH brands"). Thus, MasterMind was to perform services not only for The Art Institutes, but for other schools as well.

Then, in a transaction executed on January 7, 2019, DCEH entered into an Equity and Asset Purchase Agreement ("EAPA") in which it sold AII (and its subsidiaries, the eight AI Defendants) to Education Principal Foundation ("EPF"). Brown Decl. at ¶9. The EAPA provided that "the Foundation [will] purchase the Equity Interests of AII…" *Id.* at ¶10 & Exhibit A, EAPA, Recitals, ¶C. That sale was conditioned, however, on AII's first "purchas[ing] [from DCEH] the Business Assets which relate solely to, are used exclusively by or are held for use exclusively by the Ai University System." *Id.* Among these assets that AII acquired were DCEH's intellectual property rights, including the disputed social media accounts in this case. *Id.* at ¶10. An Amended and Restated Framework Agreement ("ARFA"), incorporated by reference into the EAPA (*see id.* at Exhibit A, EAPA, Recitals, ¶E), provided that "social media accounts" were "used or held for use by the Dream Parties and their Affiliates in the conduct of the Business," and that "[f]ollowing the date of this Agreement, the applicable University System will own all right, title and interest in and to" said social media accounts. Brown Decl. at ¶11 & Exhibit B, ARFA, §§ 2.19(a), (b).

DCEH's transfer to AII of its intellectual property rights in The Art Institutes' social media accounts is further memorialized in a contemporaneously executed "IP Assignment," which leaves no doubt about who owns these accounts. The IP Assignment provided that:

> "The Dream Parties hereby (on behalf of themselves and their Affiliates) absolutely and irrevocably **sell, transfer, assign, convey, and deliver to AII, and AII (on behalf of itself and the Ai University System) hereby accepts, all right, title and interest** in and to: (a) the (i) Marks (including the domain names) and **social media accounts set forth on <u>Schedule A</u>**, and any other Marks or social media accounts that are or were used in, held for use in, or necessary for the operation of the Business . . ."

*See* Brown Decl. at ¶12 & Exhibit C, IP Assignment, §2(a) (emphases added). Schedule A lists the web addresses to the various social media accounts that DCEH sold to AII, including both the "local" accounts associated with each of the AI Defendants, and the "national" accounts for the company's overall brand. *See id.* at Exhibit C, Schedule A.[1]

As a basis for its continued refusal to give the social media accounts and passwords back to the AI Defendants, MasterMind does not claim that it owns the accounts, but suggests instead that DCEH (or even EDMC) may still have an interest in them. That is pure conjecture and disproven not only by the transaction just described, but also by MasterMind's failure to seek recourse from these entities. If MasterMind actually believed that the social media accounts were still owned by DCEH, an entity now in receivership, then presumably MasterMind would have

---

[1] Further demonstrating that DCEH transferred its intellectual property rights to AII is the U.S. Patent and Trademark Office's ("PTO") online trademark database. The PTO's database reflects that certain trademarks assigned by DCEH to AII in the IP Assignment, such as the trademark for "The Art Institute of Austin" (*see* Brown Decl. at Exhibit C, IP Assignment, Schedule A), were assigned by DCEH to AII, who is identified as the "Last Listed Owner" for this particular trademark. *See* U.S. PATENT AND TRADEMARK OFFICE, Trademark Electronic Search System, available at http://tmsearch.uspto.gov/bin/gate.exe?f=doc&state=4809:j8tqdd.3.1 (last visited July 3, 2019). If the PTO recognizes that the trademarks listed in the IP Assignment were assigned, that would suggest that the listed social media accounts were also assigned.

intervened in that proceeding and sought payment for services from the receiver in control of that entity. The docket in that proceeding reveals, however, that MasterMind has not done any of those things. *See* Docket Sheet, *Digital Media Solutions, LLC v. South University of Ohio, LLC*, *et al.*, Case No. 1:19-cv-00145 (N.D. Ohio). MasterMind's similar argument that the bankruptcy trustee overseeing EDMC and affiliated entities "may claim an interest in the Instagram and Twitter accounts used by the Defendants" is even less plausible. D.E. 35 at p. 13. For one thing, if EDMC somehow still had rights in the accounts, then DCEH would never have acquired them, meaning MasterMind would have even less of a claim to withhold the accounts' passwords. Moreover, as with the DCEH receivership, the bankruptcy proceeding's docket sheet reflects that MasterMind has not attempted to intervene or otherwise sought to recover payment from the trustee. *See* D.E. 35-2 at Exhibits 1 & 2. MasterMind's decision to not seek relief in those actions belies its argument here that those entities own the accounts.

The foregoing evidence demonstrates that AII owns the accounts. Because it has ownership, and because MasterMind's opposition brief does not challenge any other element of the counterclaims, the AI Defendants (and AII who should be joined as a counterclaim plaintiff) are likely to succeed on their causes of actions against MasterMind for misappropriation of trade secrets, conversion, breach of fiduciary

duty, negligence, and for violation of the Computer Fraud and Abuse Act, as discussed more fully in the AI Defendants' opening brief. *See generally*, D.E. 30.

## II.   The harm to the AI Defendants and AII outweighs the harm to MasterMind.

Without complete access to their social media accounts, the AI Defendants and AII are suffering serious reputational and financial harm at the hands of MasterMind. MasterMind has not performed any social media-related services since it terminated the Agreement on January 17, 2019. *See* Suppl. Adams Decl. at ¶10 & Exhibit A (Jan. 17, 2019 email from MasterMind's president issuing stop-work notice). Although the Agreement required that it immediately return all intellectual property and confidential information, MasterMind still retains sole and exclusive possession of the accounts and passwords today, to the AI Defendants' and AII's detriment. *See* D.E. 30-1 at Exhibit A, §§5.1, 5.3, 6.1, 6.3.

MasterMind tries to paint a different picture of the facts by arguing that the AI Defendants "misled" the Court about their ability to access and post on the accounts. *See* D.E. 35 at p. 14 (claiming that the AI Defendants "have been posting to the subject Instagram and Twitter accounts without interruption from January 2019 through the date of filing this Brief."). That statement is simply not true. To the extent there was any confusion about the AI Defendants' access to the accounts, the Supplemental Adams Declaration clarifies that the AI Defendants have no access

whatsoever to most Instagram and Twitter features, and limited access to just a few features.

As an initial matter, to be very clear, the AI Defendants do not possess or otherwise know the passwords to the either the "national" or the "local" Instagram and Twitter accounts.[2] With respect to the national Instagram and Twitter accounts, there is no dispute, as MasterMind admits that it changed the passwords on January 17, 2019. *See* D.E. 35-1 at ¶¶11-12 (admitting that MasterMind changed the passwords to the national accounts); *id*. at Exhibits B-1 & B-2 (screenshot reflecting same).[3] With respect to the local Instagram and Twitter accounts, however, MasterMind seems to suggest that the AI Defendants still have access to the passwords. D.E. 35 at pp. 14-15. In particular, the Declaration of Andrew Golubock states that "[n]one of the passwords for the [local] accounts … were changed in 2019." D.E. 35-1 at ¶11. That statement, however, is awfully misleading. Even if the passwords were not "changed in 2019," MasterMind admits that on January 22, 2019, it terminated the AI Defendants' ability to view and change the local accounts'

---

[2] The AI Defendants also wish to make clear that the number of social media accounts that they do not have the access to is sixteen, including eight Instagram "local" accounts, one "national" Instagram account, six "local" Twitter accounts, and one "national" Twitter account. *See* Suppl. Adams Dec. at ¶24.

[3] The Declaration of Andrew Golubock states that MasterMind made the change to the Instagram and Twitter national accounts' passwords on January 17, 2019 in response to a potential security threat. *See* D.E. 35-1 at ¶12. If that was indeed the justification for changing the passwords, then MasterMind should explain why it has not given these passwords back given that the alleged threat has subsided.

passwords in the "LastPass" account. *See* D.E. 35-1 at ¶11.[4] LastPass is the service that MasterMind recommended to DCEH in 2018 as a secure online location where DCEH could store the social media accounts' login information (username/email account and password). *See* Suppl. Adams Decl. at ¶¶7-9. Critically, when DCEH moved the accounts' login information to LastPass in 2018, the password for each one of the accounts was reset to a random (and purposefully forgettable) grouping of characters. *See id.* at ¶14 (explaining that she did not memorize the new passwords). And so even if Mr. Golubock is correct that the local accounts' passwords were not "changed in 2019," they *were changed in 2018*. Former DCEH employee Rebecca Adams could only view these new passwords through LastPass, the service that MasterMind recommended to DCEH, and the service which MasterMind restricted her from accessing on January 22, 2019. *See id.* at ¶¶12, 14. The statement by Mr. Golubock that "Ms. Adams has had those sixteen (16) passwords at all times," therefore, is the one that is "demonstrably false." D.E. 35 at p. 14; D.E. 35-1 at ¶11. Indeed, if Ms. Adams and the AI Defendants currently possessed or otherwise knew these passwords, the parties would probably not be here today.[5]

---

[4] Specifically, as set forth in the Supplemental Adams Declaration, MasterMind restricted the access rights that Ms. Adams had previously acquired when she, as a DCEH employee responsible for The Art Institutes' social media, was created as a user on the LastPass account.

[5] In addition, the AI Defendants and AII cannot retrieve the accounts' passwords by asking Instagram and Twitter to reset them. When DCEH transitioned the accounts' login information

Without the passwords, the AI Defendants and AII are suffering great harm. The Art Institutes' online brand and reputation have been damaged, and student enrollment is down in 2019. *See* Brown Decl. at ¶18; *see also* D.E. 30 at pp. 20-22 (explaining the AI Defendants' injuries in greater detail). MasterMind suggests that AI Defendants' harm is not that significant because they have recently been posting on the "local" Instagram and Twitter accounts. *See* D.E. 35 at pp. 14-15. As the Supplemental Adams Declaration details, however, the AI Defendants can only do that because DCEH in 2018 paid for a subscription with Sprinklr, a third-party social media management platform. *See* Suppl. Adam Decl. at ¶17. After MasterMind changed the passwords to the accounts and restricted the LastPass rights, Ms. Adams and the AI Defendants managed to remain "logged in" and connected to their Instagram and Twitter accounts through Sprinklr. *Id.* at ¶18. Critically, while they can utilize Instagram's and Twitter's most basic features, like "posting," that is just about all they can do through Sprinklr. *Id.* at ¶¶18-21. They cannot utilize the many other features that Instagram and Twitter provide to users with "native" access (*i.e.*,

---

into LastPass, they also agreed, for security and efficiency reasons, that MasterMind would create and operate new email accounts that would be used in the event that a password was lost or otherwise had to be changed. *See* Suppl. Adams Decl. at ¶¶15-16. So any request made to Instagram or Twitter to reset the accounts' passwords would result in those companies sending an email to an account operated by MasterMind. In fact, Ms. Adams has contacted both companies to attempt to reset the passwords, but both have denied her requests on the ground that they can only send a password-recovery email to the account on file. *Id.*

access through the Instagram and Twitter platform itself), features which the AI Defendants use to engage with prospective students and others.

For example, with respect to the local and national <u>Instagram</u> accounts, the AI Defendants can post a single photo or a single video (with reduced image quality) at a time, and can respond to comments on those posts. *See id.* at ¶19. But that is pretty much all they can do. They cannot utilize other popular features on Instagram and Twitter, such as "liking" comments, and posting "live" stories. *See id*. They also cannot respond to direct messages, cannot update their profile pages, and cannot delete negative or abusive comments on paid-for advertisements. *See id*. The Instagram accounts collectively have around 91,600 followers. *See id.* at ¶23. If any one of them – or anyone else on Instagram – sends a direct message, the AI Defendants have no way of knowing so, and obviously cannot respond.

The AI Defendants also cannot enjoy the full range of Twitter's features. They can post (or "tweet") photos and videos, but it takes significantly more time. *See id.* at ¶21. And as is the case with Instagram, they cannot update the accounts' profile pages. Some of these profile pages are grossly outdated. *See, e.g.*, https://twitter.com/art_institutes?lang=en (national account cover page displays fireworks and states "Follow your passion in 2019"). Some also contain false statements. For example, the national account profile page – which has approximately 80,000 people following it – states that "The Art Institutes system has

locations across North America," has "programs available online," and is located in "Canada." Not one of those statements remains accurate today. *See id.*; Suppl. Adams Decl. at ¶20.

Having unrestricted native access to all the social media accounts is critical. Native access to the national accounts is especially critical, however, for they are operated on behalf of the entire Art Institute university system and the company's overall brand. Taken together, the accounts in dispute have approximately 168,000 followers. Suppl. Adams Decl. at ¶23. These people are not being reached – or responded to – in the ways they should be, due to MasterMind's withholding of the passwords. The above-described limitations and the many others discussed above, and the negative reputational and financial consequences they have had, are the "injury caused by the Plaintiff." D.E. 35 at p. 4.

The harm to MasterMind, on the other hand, is nil. MasterMind in its brief does not even purport to claim that an injunction would cause it harm. It complains that the AI Defendants seek an injunction to recover the social media accounts "without any obligation to pay the contractually agreed price" to MasterMind. D.E. 35 at p. 1. But as the AI Defendants discussed in their opening brief, whether or not MasterMind has received payment is a matter separate and apart from who has the legal right to possession and control of the accounts. *See* D.E. 30 at pp. 22-24. In an virtually-identical case, the Eastern District of Louisiana explained that it could not

"identify any harm" by ordering a party "purportedly seek[ing] additional payment from Plaintiffs for their services" to first transfer control of websites back to the owner because "such [payment] can still be sought after control of the websites is transferred." *River Servs. Co. LLC v. Peer*, No. CV 17-2691, 2017 WL 1407894, at *3 (E.D. La. Apr. 20, 2017). Like the party's argument in *River Services*, MasterMind's argument that it has not been paid for services is not the type of harm that is cognizable at the preliminary injunction stage. MasterMind's claim to payment certainly can be resolved in this litigation, just not at this stage.

## III.  <u>MasterMind's bailment theory is off the mark.</u>

MasterMind does not try to distinguish the cases cited in the AI Defendants' opening brief that have all done what the AI Defendants are now asking this Court to do. *See, e.g.*, *Ardis Health, LLC v. Nankivell*, No. 11 CIV. 5013 NRB, 2011 WL 4965172, at *2 (S.D.N.Y. Oct. 19, 2011) (issuing preliminary injunction ordering party that possessed login information to former employer's social media accounts and websites to transfer information back to employer); *River Servs.*, 2017 WL 1407894, at *2 (same). Instead, MasterMind claims – for the first time in an opposition brief to a motion for preliminary injunction – that the "rights in the Instagram and Twitter accounts, alleged to be in the exclusive possession of MasterMind, were the subject of a bailment under Georgia law," giving rise a lien in the rights to the Instagram and Twitter accounts. D.E. 35 at p. 15.

14

This bailment theory is wrong for two reasons. First, no bailment contract was formed between the parties in the first place. This Court has explained that "a bailment relationship is created when one party is involved in an undertaking for a consideration to safeguard the personal property of another and ***exercises complete dominion at all times over the property.***" *One on One Basketball, Inc. v. Glob. Payments Direct, Inc.*, No. 1:14-CV-1352-CC, 2015 WL 11257486, at *4 (N.D. Ga. Mar. 19, 2015) (quoting *Owners Ins. Co. v. Smith Mech. Contractors, Inc.*, 294 Ga. App. 754, 756, 670 S.E.2d 213, 215 (2008) *aff'd*, 285 Ga. 807, 683 S.E.2d 599 (2009) (emphasis added)). The evidence demonstrates that MasterMind acquired some limited joint control over the subject accounts and passwords with DCEH, as MasterMind shared access to the accounts with DCEH employees, but nowhere near the legally required exclusive control of the accounts and passwords that would result in a bailment contract. Former DCEH employee Ms. Adams explained in her original declaration that she and other DCEH employees could login to any of The Art Institutes' social media accounts at any time in order to post news updates and advertisements, respond to customer inquiries, and do whatever else was necessary to maintain the relevancy of company brand and online profile. *See* D.E. 30-1 at ¶10; *see also* Suppl. Adams Decl. at ¶9. The Golubock Declaration submitted with MasterMind's opposition, admits the parties shared joint control. He states that "MasterMind never had sole possession of the passwords, to the exclusion of the

Defendants or Ms. Adams. Ms. Adams had full rights in all Instagram and Twitter accounts logins and passwords during our working relationship." *See* D.E. 35-1 at ¶11. So clearly, it was never contemplated that MasterMind would be the sole entity with "complete dominion" and access to the accounts and passwords. So as a matter of Georgia law, no bailment relationship was formed, and MasterMind could not have acquired a lien or security interest in the accounts.

In any event, the second reason why MasterMind's bailment theory is wrong is that "[b]ailments involve certain implied obligations, ***but these obligations generally are implied only in the absence of an express provision to the contrary***." *Detroit Inst. of Arts Founders Soc. v. Rose*, 127 F. Supp. 2d 117, 135–36 (D. Conn. 2001) (emphasis added). Here, the terms of the Master Services Agreement would control over any lien or security interest rights that MasterMind purportedly would have acquired in the accounts as a bailee. The Agreement's terms provide, among other things, that (i) the social media accounts and passwords were property owned by DCEH (*see* Adams Decl. at Exhibit A, Agreement, §6.1, 6.6); (ii) MasterMind did not have any rights in the social media accounts and passwords (*id.* §§ 3.6, 5.2 & 6.1); (iii) MasterMind had a duty not to misuse the accounts and passwords in any way that was contrary to the purpose of the Agreement (*id.* §§5.1 & 5.6.8); (iv) MasterMind had a duty to assist DCEH or its designee to secure rights in the accounts and passwords (*id.* §6.3); (v) MasterMind was required to return the

accounts and passwords to DCEH upon request; (*id.* §§5.1, 5.3, 6.1, 6.3); and that (vi) MasterMind's obligations to do so survived the termination of the Agreement (*id.* §7.6).

It is well-established that "where the language of a contract is clear, unambiguous, and capable of only one reasonable interpretation, a court is required to enforce the contract according to its clear terms." *Kwok v. Delta Air Lines Inc.*, 578 Fed.Appx. 898, 900 (11th Cir. 2014) (affirming dismissal based upon the unambiguous terms of a contract). In this case, no bailment relationship was formed in the first place, but if it was, the Agreement's terms providing that the social media accounts and passwords are property owned by DCEH trump any implied rights MasterMind purportedly acquired.

## CONCLUSION

For the reasons set forth above and in the opening brief in support of this Motion for Preliminary Injunction, this Court should issue an order requiring the immediate transfer of the social media accounts, including all login information, back to the AI Defendants and AII.  To be clear, the AI Defendants and AII are not asking that the Court order MasterMind to provide them with the login information for the LastPass account; rather, they are only asking for an order requiring MasterMind to provide them with the login information, including usernames,

passwords, and all other administrative rights, for the sixteen Instagram and Twitter "national" and "local" accounts in dispute.

Date: July 5th, 2019

/s/ Ollie A. Cleveland, III
Ollie A. Cleveland, III (*pro hac vice*)
Alexander B. Feinberg (Georgia Bar No. 956505)
**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203-2602
(205) 254-1000
(205) 254-1999 (fax)
tcleveland@maynardcooper.com
afeinberg@maynardcooper.com

*Attorney for the AI Defendants*

## **CERTIFICATE OF COMPLIANCE AS TO FONT SIZE**

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing complies with the font and point selections approved by the Court in Local Rule 5.1C.  The foregoing was prepared on computer using Times New Roman font (14 point).

This 5th day of July 2019.

/s/ Ollie A. Cleveland, III
Ollie A. Cleveland, III (*pro hac vice*)

*Attorney for AI Defendants*

Ollie A. Cleveland, III (*pro hac vice*)
Alexander B. Feinberg (Georgia Bar No. 956505)
**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203-2602
(205) 254-1000
(205) 254-1999 (fax)
tcleveland@maynardcooper.com
afeinberg@maynardcooper.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of July, 2019, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which served

notice of this electronic filing upon the following:

> Mathew A. Schuh
> Two Midtown Plaza, Suite 1350
> 1349 West Peachtree Street
> Atlanta, Georgia 30309
> (404) 277-8421
> matt@schuhpc.com
>
> *Attorney for Plaintiff*

> /s/ Ollie A. Cleveland, III
> OF COUNSEL